## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Marilyn Williams,                                    Case No. 0:21-cv-1186 (KMM/DTS)

               Plaintiff,

v.                                                   **ORDER ON CROSS MOTIONS FOR**
                                                     **SUMMARY JUDGMENT**

BHI Energy I Power Services, LLC,

               Defendant.

       While working as a payroll specialist at a Minnesota nuclear facility, Plaintiff Marilyn Williams failed a mandatory drug test and was fired by her employer that same day. She maintains that she had been drinking a weight-loss tea that purported to be free of marijuana, and that she failed the drug test due to the tea's false advertising. In a separate action, she settled with the tea manufacturer. But this case concerns her termination, and whether it was lawful under Minnesota's Drug and Alcohol Testing in the Workplace Act ("DATWA").

       Although Ms. Williams worked at a nuclear facility operated by Xcel Energy, she was employed by Defendant BHI Energy I Power Services, LLC, one of the 300 contractors Xcel uses to run its operations. All parties agree that if Xcel had been Ms. Williams's employer and the defendant in this case, her state-law claims against Xcel would be preempted by federal law. However, the issue presented by this case is whether her claims *against BHI*—a staffing contractor for a nuclear licensee rather than the licensee itself—are also preempted. The Court answers that question in the negative and denies BHI's motion for summary judgment on that basis. It also grants Ms. Williams's motion seeking affirmative partial summary judgment. Though the parties dispute the reason for Ms. Williams's termination, the dispute is not

material because both reasons proffered by the parties flow directly from the initial positive test. Thus, the Court holds as a matter of law that BHI violated DATWA.

## BACKGROUND

### I. Regulatory Background

#### A. The Atomic Energy Act

Pursuant to the Atomic Energy Act ("AEA" or "the Act"), 42 U.S.C. § 2011 *et seq.*, the federal government regulates the creation, storage, and transportation of nuclear energy nationwide. *See Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1900–01 (2019) (citing 10 C.F.R. § 40 *et seq.*). The Act delegates authority to the Nuclear Regulatory Commission ("NRC" or "the Commission") to issue federal licenses to private entities to construct, own, or operate nuclear power facilities, and the Act delegates authority to the NRC to impose conditions on those licenses "by rule or regulation" to "effectuate the purposes and provisions" of the Act. 42 U.S.C. § 2133(a); *see also id.* at § 2201(b); 10 C.F.R. § 1.11(b). One such purpose, expressly declared by Congress in passing the Act, is to "assure public health and safety" while increasing "the productivity of the national economy and . . . to make the Nation self-sufficient in energy." 42 U.S.C. § 5801(a). Nuclear licensees must "agree to observe such safety standards to protect health and to minimize danger to life or property" as the NRC may promulgate. *Id.* at § 2133(b). The NRC has "issued an array of rules on these subjects." *Va. Uranium*, 139 S. Ct. at 1901.

A few years after the Atomic Energy Act's passage, Congress amended it to allow the NRC to offload some of its regulatory powers to the States. *See* 42 U.S.C. § 2021. The enumerated purposes of this provision include to "recognize the interests of the States" in

using nuclear energy, "establish programs for, cooperation between the States and the Commission," and "promote an orderly regulatory pattern between the Commission and State governments with respect to nuclear development and use." *Id.* at 2021(a). Under this provision, the NRC may enter agreements with the States to pass on some of the commission's preexisting regulatory authority. Section 2021, however, specifies that the NRC shall retain authority over core areas, such as the operation of any nuclear facility. *Id.* at § 2021(c). Yet it expressly provides that nothing in the section "shall be construed to affect the authority of any State or local agency" to regulate conduct "for purposes other than protection against radiation hazards." *Id.* at § 2021(k). As the Supreme Court made clear, § 2021 did not extend the NRC's power to activities "historically beyond its reach" and confirmed that "States remain free to regulate" activities "for purposes *other than* nuclear safety." *Va. Uranium*, 139 S. Ct. at 1902.

### B. Fitness-For-Duty Regulations

Among the various safety-related topics on which the NRC has promulgated rules is drug testing of employees in nuclear facilities. The NRC requires nuclear licensees and certain other entities to adopt and operate fitness-for-duty programs. 10 C.F.R. § 26.1. A compliant fitness-for-duty (or "FFD") program must, among other objectives, "[p]rovide reasonable assurance that individuals are not under the influence of any substance, legal or illegal . . . which in any way adversely affects their ability to safely and competently perform their duties." *Id.* at § 26.23(b).

Several types of entities are required to have fitness-for-duty programs and comply with the federal regulations: (1) licensees that are "authorized to operate a nuclear power

reactor," (2) licensees that are "authorized to possess, use, or transport formula quantities of strategic special nuclear material," and (3) "licensees and other entities" that receive "special nuclear material in the form of fuel assemblies." 10 C.F.R. § 26.3(a)–(c). In addition, some federal contractors are subject to the federal fitness-for-duty regulations, namely, those:

> Contractor/vendors (C/Vs) who implement FFD programs or program elements, to the extent that the licensees and other entities specified in paragraphs (a) through (c) of this section rely on those C/V FFD programs or program elements to meet the requirements of this part.

*Id.* at § 26.3(d).[1] Therefore, for the regulations to apply to a contractor, a contractor must implement an entire fitness-for-duty program or one of the enumerated program elements, *and* the nuclear licensee must rely on the contractor's program or program elements to meet its requirements under the federal regulations.

All individuals "who are granted unescorted access to nuclear power reactor protected areas" by licensees are subject to a regulated fitness-for-duty program. 10 C.F.R. § 26.4. The regulations identify "minimum sanctions" that regulated entities must impose when an individual has violated the drug and alcohol provisions of their fitness-for-duty program, but the regulations also allow regulated entities to "impose more stringent sanctions" for violations. *Id.* at § 26.75(a).

Ordinarily, a licensee or regulated entity cannot terminate someone's access or subject them to other administrative action based only on an initial, unconfirmed positive test. *Id.* at

---

[1] The regulations identify eight "program elements": (1) written policy and procedures, (2) training, (3) drug and alcohol testing, (4) behavioral observation, (5) employee assistance programs, (6) protection of information, (7) a review process for policy violations, and (8) audits and corrective action. *See* 10 C.F.R. § 26, subd. B.

§ 26.75(h).  However, the regulations carve out an exception for what regulated entities may do in response to initial, unconfirmed tests that are positive for marijuana or cocaine metabolites.  If an individual has an initial, unconfirmed positive drug test for marijuana or cocaine metabolites from a valid specimen, a licensee may "administratively withdraw" their site access or may "take lesser administrative actions," provided that there is "no loss of compensation or benefits" to the individual during the "period of temporary administrative action."  *Id.* at § 26.75(i).

Once an initial positive test has been confirmed positive for any type of drug, the violation *must* result in a minimum of "termination of the individual's authorization" for site access "for at least 14 days."  *Id.* at § 26.75(e)(1).  Regulated entities can "impose more stringent sanctions" for violations of their fitness-for-duty programs.  *Id.* at § 26.75(a).

### C.  Minnesota's Protections

Minnesota's law governing drug and alcohol testing in the workplace, DATWA, affords protections to employees and job applicants, and it places limits on an employer's ability to use drug and alcohol testing in employment decisions.  Minn. Stat. §§ 181.960–67.[2]  DATWA has a provision that expressly speaks to federal preemption, stating that the statute does "not apply to employees and job applicants where the specific work performed requires those employees and job applicants to be subject to drug and alcohol testing pursuant to . . . federal

---

[2]    Although the Minnesota Legislature enacted cannabis-related amendments to DATWA during the 2023 Regular Session, *see* 2023 Session Laws, Chap. 63, Art. 6, this Court is tasked with analyzing the version of DATWA that was in effect at the time Ms. Williams was tested.  *See generally Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 837 (1990). Further, the amendments do not change BHI's obligations under DATWA.

regulations or requirements necessary to operate federally regulated facilities." Minn. Stat. §

181.957, subd. 1. But, a subsequent provision clarifies that the employers of employees subject

to federal drug testing must still comply with DATWA's protections for employees "to the

extent" that they "are not inconsistent with or specifically preempted by the federal

regulations." Minn. Stat. § 181.957, subd. 2.

DATWA provides greater affirmative protections to workers than what is required by

the federal regulations governing drug testing of individuals at nuclear facilities. For instance,

DATWA requires that employers give employees the right to explain a positive test:

> If an employee or job applicant tests positive for drug use, the
> employee must be given written notice of the right to explain the
> positive test and the employer may request that the employee or
> job applicant indicate any over-the-counter or prescription that
> the individual is currently taking or has recently taken and any
> other information relevant to the reliability of, or explanation for,
> a positive test result.

Minn. Stat. § 181.953, subd. 6(b). Another provision prohibits employers from terminating

employees based upon an initial, unconfirmed positive test:

> An employer may not discharge, discipline, discriminate against,
> or request or require rehabilitation of an employee on the basis
> of a positive test result from an initial screening test that has not
> been verified by a confirmatory test.

*Id.* at § 181.953, subd. 10(a). However, an employer may "temporarily suspend" or transfer

the employee based upon an initial, unconfirmed positive test if the employer believes it is

"reasonably necessary to protect the health of safety of the employee, coemployees, or the

public." *Id.* at § 181.953, subd. 10(c).

As for confirmed tests, if an initial positive test is subsequently confirmed and is an

employee's first positive test, DATWA prohibits the employer from terminating the employee

before offering them an opportunity to complete a rehabilitation or counseling program (at the employee's expense) chosen in consultation with a certified physician or substance abuse expert. *Id.* at § 181.953, subd. 10(b).

## II. Factual Background

### A. The Job

BHI hired Ms. Williams to be a "Field Administrator Manager" at Xcel's nuclear facility in Monticello, Minnesota in May 2019. [Ex. D, Dkt. No. 112-1.] In this role, she performed administrative duties relating to accounting and finance on site, such as processing payroll for BHI employees working at the Xcel plant. [Dkt. No. 104-14.] Due to the pandemic, Ms. Williams worked from home from March 27, 2020 to her termination on July 20, 2020. [BHI Opp'n 4–5, Dkt. No. 120.]

### B. The Positive Test

Because it is subject to the federal fitness-for-duty regulations, Xcel conducts random drug tests of all individuals with unescorted access to its nuclear facilities, including employees of contractors like BHI. [BHI Mem. 10, Dkt. No. 110.] Xcel selected Ms. Williams for a drug test on July 15, 2020. [Dkt. 113-3.] She reported to Xcel for the test. [Young Dep. 15–16, Dkt. No. 104-30.] Xcel administered the test, and it came back positive for "marijuana (THC) metabolite" on July 20. [Dkt. No. 113-4.] Ms. Williams told several people, including Xcel and BHI employees, that she suspected her positive test was due to a weight loss tea she

recently had started drinking that advertised itself as being free of THC.[3]  [BHI Mem. 10; Williams Mem. 11–12.]  The day her test came back positive, Xcel placed Ms. Williams's unescorted site access on a 14-day administrative hold and removed her from the property. [Young Dep. 16, Dkt. No. 104-30; *see also* Dkt. Nos. 104-8, 104-18.]

Xcel notified BHI of Ms. Williams's positive test, and within hours, BHI terminated Ms. Williams.  [Williams Mem. 11–12.]  The document providing the explanation for termination stated that "Marilyn failed a random drug test by the client" but also described that Xcel had put her access on administrative hold pending final outcome of her test results. [Disciplinary Action Report, Dkt. No. 104-8.]

Ms. Williams pursued the opportunity Xcel offered to have her sample retested, and her retest confirmed a positive result for THC on July 26, 2020 (after she was already terminated by BHI).  [Williams Mem. at 12.]  Xcel fully revoked, or denied, her access on July 30, 2020.  [*Id.*]  Xcel informed Ms. Williams that she had the right to request a review of this decision and to request a confirmatory retest.  [*Id.*]  Ms. Williams pursued this option, and the decision to deny her access was upheld on September 21, 2020.  [*Id.* at 13.]

### C.  The Lawsuit

Ms. Williams sued BHI, alleging a single claim for wrongful termination in violation of DATWA.  Specifically, Ms. Williams asserts that BHI violated DATWA by: (1) failing to give her written notice of the right to explain her positive drug test, (2) terminating her based on

---

[3]     Upon the recommendation of Xcel's Medical Review Officer, Ms. Williams tested the "THC-free" tea she had been consuming around the time of her test at Xcel, and the tea tested positive for THC.  [*See* Compl. ¶¶ 25, 35; *see also* Williams Dep. 90, Dkt. No. 104-23.].

an initial positive drug test, and (3) terminating her without giving her the opportunity to complete a counseling or rehabilitation program.  [Compl. ¶¶ 42–44.]

BHI moved to dismiss her complaint for the same reasons it raises in its summary judgment motion regarding preemption.  [*See* BHI Mem. Mot. to Dismiss, Dkt. No. 10.]  Judge Tostrud denied the motion from the bench.  [*See* Dkt. No. 22.]  He reasoned that Ms. Williams plausibly alleged that BHI does not implement a fitness-for-duty program or program elements that Xcel relies upon, and as such, is not subject to the federal fitness-for-duty regulations.  [Tr. Hr'g Mot. to Dismiss 23, Dkt. No. 26.]

Both parties have now filed cross-motions for summary judgment.  BHI moves for summary judgment on the basis of preemption, contending that Ms. Williams's claims are subject to both field and conflict preemption.  Ms. Williams moves for partial summary judgment, claiming that she is entitled to a finding of liability under DATWA as a matter of law and that damages should proceed to trial.

## DISCUSSION

Summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Dowden v. Cornerstone Nat'l Ins. Co.*, 11 F.4th 866, 872 (8th Cir. 2021).  The moving party must demonstrate that the material facts are undisputed.  *Celotex*, 477 U.S. at 322.  A fact is "material" only if its resolution could affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When the moving party properly supports a motion for summary judgment, the party opposing summary judgment may not rest on mere allegations or denials, but must show,

through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Id.* at 256; *McGowen, Hurst, Clark & Smith, P.C. v. Com. Bank*, 11 F.4th 702, 710 (8th Cir. 2021). A dispute of fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Courts must view the inferences to be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Irvin v. Richardson*, 20 F.4th 1199, 1204 (8th Cir. 2021). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quotations omitted). When, like here, there are cross-motions for summary judgment, the Court views the record in the light most favorable to the defendant when considering the plaintiff's motion, and in the light most favorable to the plaintiff when evaluating the defendant's motion. *Durand v. Fairview Health Servs.*, 230 F. Supp. 3d 959, 965 (D. Minn. 2017).

## I.  BHI's Motion

BHI contends that it is entitled to summary judgment because Ms. Williams's state-law claims are preempted by federal law. Preemption stems from the Supremacy Clause, which declares federal law "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Federal law can preempt state law in one of three ways: (1) by express statutory language, (2) by occupying the entire legislative or regulatory field, or (3) by conflicting with state law. *See WinRed, Inc. v. Ellison*, 59 F.4th 934, 941 (8th Cir. 2023). These labels and categories, however, "are not rigidly distinct." *Va. Uranium*, 139 S. Ct. at 1901 (quoting *Crosby v. Foreign Trade Council*, 530 U.S. 363, 372 n.6 (2000)). "Unlike many federal statutes, the [Atomic Energy Act] contains no provision

preempting state law," *id.* at 1902, and the parties agree that there is no express preemption. [*See* BHI Mem. 20–26; Williams Opp'n 13.]

That leaves this Court to consider whether Mr. Williams's claims are subject to either field or conflict preemption. The party asserting preemption—here, BHI—has the burden of establishing that it applies. *Lowry v. City of Minneapolis*, Case No. 21-CV-2189 (PJS/TNL), 2022 WL 2763757, at *4 (D. Minn. July 15, 2022).

### A. Field Preemption

BHI's argument for field preemption is quite simple: the federal government has occupied the field of nuclear safety, Ms. William's DATWA claims against BHI infringe upon that field, and therefore, her claims must be rejected. Despite the tempting simplicity of this argument, it does not carry the day.

As a preliminary matter, the Court must determine whether BHI has brought a facial or as-applied preemption challenge. *See Puente Arizona v. Arpaio*, 821 F.3d 1098, 1105 (9th Cir. 2016) (recognizing that preemption arises via facial or as-applied challenges). In *Keller v. City of Fremont*, 719 F.3d 931, 945 (8th Cir. 2013), the Eighth Circuit rejected the plaintiffs' facial field-preemption challenge and warned that "facial challenges are disfavored." Because the Eighth Circuit has recognized a distinction between facial and as-applied preemption challenges, the Court rejects BHI's suggestion that preemption only "considers two things: the federal law and the state law" and does not require "the factual application of each law to the specifics of any particular situation." [BHI Reply 3–4, Dkt. No. 125.]

There is no doubt that BHI raises an as-applied challenge here. DATWA is a general employment statute applicable to all employers in all industries, and the States "possess broad

authority under their police powers to regulate the employment relationship to protect workers." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 588 (2011) (quotation omitted). BHI cannot credibly argue that DATWA, on its face, is unconstitutional or attempts to regulate within a field the federal government has entirely occupied. The Court's analysis is instead limited to evaluating whether DATWA infringes a preempted field *as applied to BHI*.

### 1. A Shifting Test

The first step in determining whether Congress "ousted the States from regulating in a particular field" is identifying what that field is. *Kansas v. Garcia*, 140 S. Ct. 791, 804 (2020). The field should be identified with specificity, because a court "must know the boundaries of that field before [it] can say that [Congress] has precluded a state from the exercise of any power reserved to it by the Constitution." *Keller*, 719 F.3d at 942 (quoting *DeCanas v. Bica*, 424 U.S. 351, 360 n.8 (1976)).

Helpfully, this Court does not write on a blank slate in defining the field at issue for preemption under the Atomic Energy Act because the Supreme Court has already brought its contours into focus. Admittedly, the Supreme Court's view of field preemption with respect to the nuclear industry has shifted over time. BHI relies on a line from one of the Court's earliest decisions on this topic, in which the Court broadly proclaimed that "the federal government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the states." *Pac. Gas and Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 212 (1983). If this one line were all that guided preemption analysis, BHI might stand on firmer footing in arguing that Ms. Williams's claims are preempted because she worked at a nuclear facility, and drug testing relates to safety. But a comprehensive

review of the Supreme Court's field preemption decisions involving the nuclear industry reveals that its jurisprudence demands a more exacting analysis.

In *Pacific Gas*, despite its broad pronouncement that the federal government "occupied the entire field of nuclear safety," the Court ultimately upheld a state law that directly regulated that area. California had conditioned the construction of new nuclear power facilities on state regulatory approval of nuclear waste storage plans, but the state law was not preempted, in the Court's eyes, because the state's purpose in enacting it was economic in nature, rather than focused on safety. *Id.* at 216. The touchstone of the test the Court announced in *Pacific Gas* was legislative intent, and the Court drew a line between state laws enacted for purposes of nuclear safety and those enacted for other objectives. *Id.* And there is statutory support for the intent-based line the Court selected in *Pacific Gas*. The Atomic Energy Act, as amended in 1959, allows the federal government to cede regulatory authority to the states outside of core areas like the "construction and operation" of nuclear facilities, but it expressly provides that states retain authority to regulate such core activities "for purposes other than protection against radiation hazards." 42 U.S.C. §§ 2021(c), (k).

Even at the time of the decision, not everyone agreed with *Pacific Gas*'s approach. In his concurrence, Justice Blackmun disagreed with how broadly the majority defined the field and thought it unwise for the Court's test to be based on analyzing a state legislature's intent. *See id.* at 224–29 (Blackmun, J. concurring in part and concurring in the judgment).

This criticism grew sharper a year later, when the Court took up another preemption challenge involving the nuclear industry. In *Silkwood v. Kerr-McGee Corporation*, 464 U.S. 238 (1984), the Court held that a state-law award of $10 million in punitive damages arising out of

a contamination incident at a nuclear facility was not preempted under either field or conflict preemption. *Id.* at 258. The majority opinion, written by the same justice as *Pacific Gas*, walked back from the broadly defined field it identified just a year earlier. The defendant, like BHI, relied upon the same language in *Pacific Gas*, but the Court disagreed that *Pacific Gas* "is dispositive of the issue in this case" and explained that "the preempted field does not extend as far as [the defendant] would have it." 464 U.S. at 249. Even though a state-law punitive damages award for radiation injuries seems intertwined with nuclear safety concerns, the Court upheld the award. Noting the tension between the ideas that "safety regulation is the exclusive concern of the federal [government]" and that "a state may nevertheless award damages based on its own law of liability," the Court concluded that Congress intended to "tolerate whatever tension there was between them." *Id.* at 256. A forceful dissent by Justice Blackmun characterized *Silkwood* as "plainly incompatible" with *Pacific Gas* and again advocated against a test rooted in legislative purpose. *Id.* at 273 (Blackmun, J. dissenting).

The tide turned just a few years later, when the Court heard yet another preemption challenge in the context of nuclear safety. In *English v. General Electric Co.*, 496 U.S. 72 (1990), Justice Blackmun, this time writing for a unanimous Court, revised the Court's field preemption test to deemphasize legislative purpose. *English* asked the Court to decide whether federal law preempted state-law claims for intentional infliction of emotional distress and unlawful retaliation brought by an employee who was terminated after reporting safety violations to the NRC. The Court again backed away from a hyper-literal application of the line from *Pacific Gas* suggesting that Congress occupied the entire field "of nuclear safety." *Id.* at 82. It rejected the defendant's argument that "the pre-empted field of 'nuclear safety' is a

large one" and that the plaintiff's claims were "pre-empted by Congress' decision to have the Federal Government exclusively regulate the field of nuclear safety." *Id.*

*English* shifted the focus of the Court's test from one of intent to one of effect. For a state law to fall within the preempted field of nuclear safety, according to *English*, "it must have some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels." *Id.* at 85. The Court acknowledged that an employment discrimination claim like the plaintiff's would have "some effect" on the decisions of nuclear licensees but did not find the effect to be substantial enough to warrant preemption. *Id.* at 85. Pointing to general employment statutes like state minimum wage and child labor laws, the Court warned that "not every state law that in some remote way may affect the nuclear safety decisions made by those who build and run nuclear facilities can be said to fall within the pre-empted field." *Id.*

Fast forward to 2019, when the Court took up another preemption challenge involving the nuclear industry. This time, Justice Gorsuch, writing for a plurality, tried to modernize and make sense of the Court's precedents in *Pacific Gas*, *Silkwood*, and *English*. In *Virginia Uranium*, the Court held that Virginia's law banning uranium mining, purportedly for safety concerns, was not preempted. 139 S. Ct. at 1907–09. Both the lead opinion (speaking for Justices Gorsuch, Thomas, and Kavanaugh), *id.* at 1903, and the concurring opinion (speaking for Justices Ginsburg, Kagan, and Sotomayor), *id.* at 1913, chided the parties asserting preemption for leaning too heavily on the line from *Pacific Gas*. The lead opinion emphasized that preemption of state laws is "a serious intrusion into state sovereignty," *id.* at 1904, and a

party must "point specifically to a constitutional text or a federal statute" rather than relying on "some brooding federal interest," *id.* at 1901 (internal quotation omitted).

Examining the text of the Atomic Energy Act, and specifically the amendments codified in § 2021, the Court explained that by permitting States to "regulate the activities discussed in § 2021 for purposes *other than* nuclear safety," this part of the statute "might be described as a *non-preemption* clause." *Id.* at 1902 (emphasis in original). *Virginia Uranium* clarified the test for field preemption yet again, this time drawing the focus away from purpose or effect and instead toward the type of activity the state law regulates. Hewing to the text of § 2021(c) and § 2021(k), *Virginia Uranium* cabined when courts can consider legislative intent at all. Only when state laws regulate the activities discussed in § 2021(c)—the "core powers" reserved to the federal government to regulate, including the construction and operation of nuclear power plants—should courts inquire into the state's purpose in enacting the law under §2021(k). *See id.* at 1903–04 ("But the activity Virginia's law regulates . . . isn't one § 2021 discusses, so subsection (k) does not authorize any judicial inquiry into state legislative purpose in this case."); *see also id.* at 1914 (Ginsburg, J., concurring, joined by Sotomayor and Kagan, JJ.) ("[Section] 2021(k) stakes out the boundaries of the preempted field, *i.e.*, state laws that apply to federally licensed activities and are driven by concerns about the radiological safety of those activities. We have no license to expand those boundaries."). Otherwise, when state laws do not infringe upon an enumerated core activity, courts need not engage in the "fraught enterprise" of trying to "peer inside legislators' skulls." *Id.* at 1907. Because Virginia's law did not regulate a core activity described in the Atomic Energy Act, the Court declined to consider Virginia's purpose for enacting the law, determined the federal government "doesn't occupy

16

the field of radiation safety in uranium mining," and held that Virginia's law was not preempted. *Id.* at 1907.

*Virginia Uranium* leaves some question as to how much of the effects-driven test articulated in *English* survives. After determining that Virginia's law did not regulate a core activity, the Court did not scrutinize whether the state law had a "direct and substantial effect" on the safety decisions of those who operate nuclear facilities. *English*, 496 U.S. at 85. Chief Justice Roberts, in his dissent joined by Justice Breyer and Justice Alito, criticized the lead opinion and concurrence for avoiding the specific question presented, which asked whether a state may "purport to regulate a non-preempted field" with a law that has "the purpose and effect of indirectly regulating a preempted field." *Va. Uranium*, 139 S. Ct. at 1917 (Roberts, C.J., dissenting, joined by Breyer and Alito, JJ.). The dissent emphasized that the Court's "precedent is clear: the AEA prohibits state laws that have the purpose *and effect* of regulating preempted fields." *Id.* at 1916 (emphasis added). But because the Court did not expressly overrule *English* in *Virginia Uranium*, and, in fact, cited it with approval, this Court concludes that it is still bound by the test announced in *English*, even if it may fall secondary to the core activities test announced in *Virginia Uranium*.

The resulting dichotomy found in *Virginia Uranium* essentially creates a two-part test for preemption of state laws in the field of nuclear safety pursuant to the Atomic Energy Act. First, if a state law regulates a core activity described in 42 U.S.C. § 2021(c), the state law is preempted only if it was enacted for the purpose of addressing nuclear safety. *Va. Uranium*, 139 S. Ct. at 1903–04. If it was enacted "for purposes other than protection against radiation hazards," 42 U.S.C. § 2021(k), it is not preempted. Second, regardless of whether the state

law regulates a core activity, it can still be preempted if it has a "direct and substantial effect" on the radiological safety decisions of those who construct or operate nuclear facilities. *English*, 496 U.S. at 85.

### 2. Application to Ms. Williams's Claims

BHI fails to persuade the Court that Ms. Williams's claims are preempted under either approach. Under the core-activity test announced in *Virginia Uranium*, when a state law regulates a core activity left to the federal government in the Atomic Energy Act, the state law is preempted only if it is enacted for purposes of nuclear safety. Here, a law governing when an employer can take adverse actions based on a positive drug test against an employee who works in a nuclear facility arguably encroaches upon an enumerated core activity, *i.e.*, the "operation of any production or utilization facility." 42 U.S.C. § 2021(c).

Because the law encroaches upon a core activity listed in § 2021(c), a limited inquiry into legislative intent is permitted. By its own terms, the AEA does not supplant state legislation that regulates such activities for "purposes other than protection against radiation hazards." *Id.* at § 2021(k). The Court need not "peer inside legislators' skulls," *Virginia Uranium*, 139 S. Ct. at 1907, to know that the Minnesota legislature had purposes other than nuclear safety in mind when it enacted a generally applicable workers' protection statute. BHI cannot credibly argue otherwise, and it has not pointed to any legislative history or other evidence suggesting Minnesota's lawmakers were concerned with nuclear safety when they enacted DATWA. *See Lowry*, 2022 WL 2763757, at *4 (placing the burden on the party seeking preemption). Therefore, under *Virginia Uranium*, Ms. Williams's DATWA claims against BHI

do not infringe upon a field the federal government has implicitly occupied to the exclusion of the states.

Ms. Williams's claims against BHI are similarly not preempted under the effects-based test articulated in *English*. Under that test, even though Minnesota did not enact DATWA for the purpose of addressing nuclear safety concerns, Ms. Williams's claims could still be preempted if they have a "direct and substantial effect" on the radiological safety decisions of nuclear licensees. 496 U.S. at 85. It is important to keep in mind who the parties are here: BHI is the defendant, not the nuclear licensee, Xcel. BHI has not established that applying DATWA *to BHI* would have a direct and substantial effect *on Xcel*.

Certainly, claims brought against nuclear licensees under state drug-testing laws (or other generally applicable employment laws) would be preempted. There are many such examples. *See, e.g.*, *Boldt v. N. States Power Co.*, 259 F. Supp. 3d 954, 959 (D. Minn. 2017); *Tomek v. STP Nuclear Operating Co.*, No. 3:17-CV-00340, 2018 WL 4403281, at *4 (S.D. Tex. Aug. 28, 2018), *report and recommendation adopted*, No. 3:17-CV-00340, 2018 WL 4384170 (S.D. Tex. Sept. 14, 2018); *Hanni v. Cleveland Elec. Illuminating Co.*, 622 N.E. 2d 340, 341 (Ohio Ct. App. 1993). Ms. Williams conceded at the hearing that if Xcel was the defendant, her DATWA claims would be preempted. But this case is different. Cases like *Boldt* have limited applicability when the plaintiff's claims are brought against a contractor of a nuclear licensee rather than the nuclear licensee itself.

This appears to be a matter of first impression. Neither the Court nor either party identified a case addressing the question of preemption with respect to contractors of nuclear licensees. In the absence of pertinent caselaw, the Court turns to the text of the federal fitness-

for-duty regulations in the atomic energy arena and the facts of this case that shed light on the relationship between Xcel and BHI.

The fitness-for-duty regulations explicitly distinguish nuclear licensees (those granted a license under the AEA to operate nuclear facilities) from contractors. The NRC limited the scope of its fitness-for-duty regulations to certain, enumerated entities. *See* 10 C.F.R. § 26.3 ("Scope"). The regulations only apply to contractors of nuclear licensees that "implement FFD programs or program elements, *to the extent that the licensees and other entities specified in paragraphs (a) through (c) of this section rely on those C/V FFD programs or program elements* to meet the requirements of this part." *Id.* at 26.3(d) (emphasis added). BHI contends that the fitness-for-duty regulations apply to BHI because it "implements" Xcel's fitness-for-duty program. Such an interpretation is unmoored from the text of the regulations. For BHI to be a contractor subject to the federal fitness-for-duty regulations, Xcel must rely on BHI's fitness-for-duty program or program elements, not the other way around. In denying BHI's Motion to Dismiss, Judge Tostrud rejected BHI's interpretation of the regulations, and nothing has surfaced through discovery or during the intervening time to support BHI's position that it is covered by these regulations.

Gina Maunu, Xcel's fitness-for-duty coordinator and designated corporate officer under Federal Rule of Civil Procedure 30(b)(6), testified repeatedly that Xcel does not rely on BHI's fitness-for-duty program or program elements to meet Xcel's requirements pursuant to the federal regulations. [*See generally* Manau Dep., Dkt. No. 104-24.] She confirmed that Xcel has its own fitness-for-duty program and program elements. [*Id.* at 12.] Xcel has "never approved" any BHI fitness-for-duty program or program element and has never relied on any

such program or program element from BHI to meet Xcel's obligations under federal law.  [*Id.* at 11, 12.]  Ms. Maunu explained that BHI is not an approved fitness-for-duty contractor on Xcel's Qualified Supplier List, though other contractors meet this definition.  [*Id.* at 18, 21.] She further confirmed that contractors are not involved with Xcel's appeals process when there has been a fitness-for-duty violation.  [*Id.* at 129.]  She agreed with a question from BHI's counsel that BHI simply has to "comply with [Xcel's] program in every respect."  [*Id.* at 137.] BHI's Chief Operating Officer even conceded in his deposition that "BHI Energy does not have a fitness for duty program" in its nuclear division.  [Rubin Dep. at 29, Dkt. 104-26.]  And at the hearing on this motion, BHI agreed that Xcel relies upon its own fitness for duty program.  It even agreed that BHI is not covered by these regulations itself because it is not a licensee.  There is no triable issue on the question of whether the federal fitness-for-duty regulations apply to BHI.  They plainly do not.

To be sure, BHI had a contractual obligation to follow the federal regulations by complying with Xcel's fitness-for-duty program.  [*See* Conner Dep. at 31, 60; Dkt. No. 123-1.] But a company agreeing to do something via contract is not the same as having federal law compel it to do so—especially in the preemption context, where the Supreme Court has instructed litigants to "point specifically to a constitutional text or a federal statute" or some "clear congressional command" that does the preempting.  *Va. Uranium*, 139 S. Ct. at 1901, 1904.  Parties cannot agree, by contract, to change the express scope of federal law.  *Accord Bepex Int'l, LLC v. Hosokawa Micron BV*, Case No. 19-cv-2997 (KMM/JFD), 2023 WL 2975699, at *5 (D. Minn. Apr. 17, 2023) (collecting cases rejecting arguments that contractual provisions "can rewrite the substantive terms and reach of a statute").  Here, there is no

genuine dispute of material fact that the federal fitness-for-duty regulations do not directly apply to BHI.

That is not to say that the scope of regulations necessarily determines the boundaries of every field for preemption analysis.  In *Kurns v. Railroad Friction Prodcuts Corp.*, 565 U.S. 625, 633–37 (2012), the Court rejected the petitioners' argument that the scope of the preempted field was "coextensive" with the scope of regulations because the Court was bound by its prior precedent in *Napier v. Atlantic Coast Line Railroad Co.*, 272 U.S. 605 (1926), in which it had identified the specific field preempted by the Locomotive Inspection Act in different terms. *But see Capron v. Off. of Att'y Gen. of Massachusetts*, 944 F.3d 9, 24 (1st Cir. 2019), *cert. denied*, 141 S. Ct. 150 (2020) (finding state-law wage and hour claims brought against host families not preempted by the Fulbright-Hays Act and federal au pair regulations because the regulations were "directed at the sponsors . . . not the host families themselves").  But even beyond a focus solely on the regulations, where the Court's field preemption test under the AEA rests on the effect that state law would have on the safety decisions of nuclear licensees, the fact that the federal fitness-for-duty regulations expressly do not apply to a licensee's contractor suggests that applying state law to that contractor would not have a "direct and substantial effect" on the licensee.

What the scope of the regulations suggests, the factual record confirms.  Xcel and BHI's actions in the wake of Ms. Williams's initial positive test dispel any notion that applying DATWA to BHI would have a direct and substantial effect on Xcel.  Xcel was following its own fitness-for-duty program and procedures with respect to Ms. Williams, and BHI's decisions regarding her employment were independent of Xcel's.

Xcel's standard procedures for dealing with a positive drug or alcohol test are as follows. Xcel will contact an individual with unescorted access, or their employer, to notify them that Xcel has selected the individual for a random drug test. [Young Dep. 12–13, Dkt. No. 104-30.] If the individual tests positive, their access is immediately placed on an "administrative hold" for "at least 14 days." [Maunu Dep. 53, 65, Dkt. No. 104-24.] The individual can then undergo an assessment as part of the Employee Assistance Program offered by Xcel or its contractors, where a physician is tasked with identifying whether the individual has a substance abuse issue and provides rehabilitation recommendations to Xcel. [*Id.* at 69–70.] Xcel's Medical Review Officer and Substance Abuse Expert then reviews the assessment and makes an independent determination of the individual's fitness for duty. [*Id.* at 70.] Xcel can agree with the assessing physician's recommendations or make its own rehabilitation plan for that individual. [*Id.* at 70–72.] Xcel then communicates the rehabilitation plan to the individual. [*Id.* at 72.]

If the assessing physician finds that there is no substance abuse issue, and Xcel's Medical Review Officer agrees, the individual can regain access after the 14-day administrative hold, as long as they agree to follow-up testing for three years, the minimum required by federal law. [*Id.* at 74, 104.] Ms. Maunu, Xcel's fitness-for-duty coordinator, recalled an instance of this happening, where a worker who had tested positive without a substance abuse issue regained access to Xcel's facilities after the temporary administrative hold. [*Id.* at 73–74.]

However, if Xcel's doctor believes there is a substance abuse issue, termination still would not necessarily result. Instead, the individual would need to complete a rehabilitation program before being able to regain access to the nuclear facilities. [*Id.* at 104.] The minimum

23

program for an individual with a first-time positive test is an 8-hour weekend class.  [*Id.* at 65,

105.]  If the individual completes the rehabilitation plan imposed by Xcel's Medical Review

Officer, the Site Supervisor would then request reauthorization for the individual.  [*Id.* at 51,

71.]  Xcel would review the request, and if it decides to reinstate their unescorted access, the

individual must then recomplete the "in-processing" steps they completed to get initial access

to Xcel's nuclear facilities.  [*Id.* at 71–72, 106.]  Ms. Maunu confirmed that the "process itself

is the same for everybody, regardless of being an employee or contractor."  [*Id.* at 140.]

With respect to Ms. Williams, Xcel randomly selected her for a drug test on July 15,

2020.  [Dkt. 113-3.]  Ms. Williams reported to Xcel for the test.  [Young Dep. 15–16, Dkt.

No. 104-30.]  Xcel administered the test, and it came back positive for "marijuana (THC)

metabolite" on July 20.  [Dkt. No. 113-4.]  That day, Xcel placed Ms. Williams's unescorted

access on the temporary "administrative hold" for fourteen days, pursuant to its policies.

[Young Dep. 16, Dkt. No. 104-30; *see also* Dkt. Nos. 104-8, 104-18.]  She was removed from

Xcel's property at that time.  [Young Dep. 16, Dkt. No. 104-30.]  Ms. Williams called Terry

Young, Xcel's Construction Supervisor and BHI liaison, to explain she believed it was a false

positive from the weight loss tea she had started consuming that week.  [*Id.* at 19.]  Mr. Young

told her to work through Xcel's Access Authorization team, get documentation, and look for

information on how to appeal the decision through Xcel.  [*Id.*]

Cutting Xcel's process short, however, BHI simply terminated Ms. Williams on July

20, the same day as her initial positive test.  [*See* Disciplinary Action Report, Dkt. No. 104–8;

Williams Dep. 85–86, Dkt. No. 104-23; Grisgby Dep. 47–48; Dkt. No. 104-27.]  Xcel

employees confirmed they had no role in the decision to terminate Ms. Williams's

employment.  [Young Dep. 19, Dkt. No. 104-30; Maunu Dep. 55, 75–78, Dkt. No. 104-24.]

As a result of BHI's termination, Xcel fully revoked or "terminated" Ms. Williams's access on

July 30, the same day that it informed her that the retest of her sample was confirmed positive.

[Dkt. No. 104-10; Dkt. No. 104-9.]  Because BHI fired Ms. Williams, Xcel's fitness-for-duty

coordinator explained that "there was no longer a need for that individual to maintain access"

to Xcel's facilities.  [Maunu Dep. 78–79, Dkt. No. 104-24.]  Had BHI not terminated her, the

coordinator testified that Xcel would have proceeded with the steps set forth above, *i.e.*,

assessment by a physician, review of the assessment by its Medical Review Officer and

Substance Abuse Expert, and a tailored rehabilitation plan if necessary.  [*Id.* at 79–80.]  That

is not to say, of course, that Ms. Williams *would* have regained her access as a matter of fact,

but rather that BHI's decision to terminate her cut off Xcel's reauthorization process.  Ms.

Maunu confirmed that Xcel will not pursue rehabilitation and reauthorization of access in the

absence of a contractor's request for access for its worker.  [*Id.* at 55.]

These facts demonstrate how applying DATWA to BHI would have little impact, let

alone a "direct and substantial" one, on the "radiological safety" decisions of Xcel.  *English*,

496 U.S. at 85.  Ms. Williams contends that BHI violated DATWA in three ways: (1) by failing

to notify her of her right under state-law to explain the positive test to BHI, (2) by terminating

her based on an initial unconfirmed positive drug test, and (3) by terminating her without an

opportunity to participate in a rehabilitation program.  Requiring BHI to provide these

protections to Ms. Williams would not impact Xcel's safety decisions because Xcel was

implementing its own program pursuant to its own policies.  Xcel is singularly responsible for

access decisions as to all individuals.  BHI cannot override Xcel's fitness-for-duty decisions.

[Maunu Dep. 118, Dkt. No. 104-24.]  Xcel would have suspended Ms. Williams's access for 14 days regardless of BHI's actions, pursuant to what is required by the federal regulations and Xcel's own fitness-for-duty program.  It would not have reinstated Ms. Williams's access without her meeting its requirements, which include a completed assessment, review by its Substance Abuse Expert, and a completed rehabilitation plan, if necessary.  Imposing state-law restrictions on what BHI must do before terminating Ms. Williams has no effect on Xcel's access decisions.  And requiring BHI to inform Ms. Williams of a right to explain her positive test to BHI has no impact whatsoever on Xcel's safety decisions.

To be sure, applying DATWA's requirements to *Xcel* would have an effect on *Xcel's* safety decisions.  But not BHI.  At bottom, Xcel has its own fitness-for-duty program, which complies with the federal fitness-for-duty regulations to which Xcel is subject.  Xcel carries out its program independently of BHI's decisions, even if BHI contractually agrees to follow Xcel's program.  BHI being subject to DATWA would not affect Xcel's ability to implement its own fitness-for-duty program and make its own individual access decisions.  Any suggestion to the contrary requires speculation about different facts than the ones before this Court.

The Court does not take lightly the gravitas of the regime at issue in this case and the not insignificant concerns that led the Supreme Court in 1983 to announce nuclear safety as a field where federal law preempts state regulation.  However, the field of nuclear safety is not limitless.  When the Supreme Court's tests for field preemption under the Atomic Energy Act are applied to the undisputed facts of this case, it becomes evident that Ms. Williams's DATWA claims against BHI are not preempted as a matter of law.

### B. Conflict Preemption

Even if the DATWA claims are not preempted under field preemption, BHI also contends that they are preempted due to conflict preemption. Conflict preemption occurs when complying with both federal and state law is a "physical impossibility" or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *WinRed*, 59 F.4th at 944. BHI has not demonstrated that it is entitled to summary judgment based on conflict preemption.

The Court does not believe that an impossibility analysis is necessary in this case because it already concluded that the federal fitness-for-duty regulations do not apply to BHI, and therefore BHI is not required by law to comply with both state and federal obligations in this area. But even if BHI were directly subject to the federal regulations, it would not be physically impossible for BHI to comply with both the state and federal requirements related to drug testing in the workplace. BHI identifies two potential conflicts relating to what employers may do after an initial positive test and after a confirmed positive test, but close inspection of the text of DATWA and the federal regulations reveals these alleged conflicts to be illusory.

Consider first what state and federal law require after an initial, unconfirmed positive test. The federal regulations do not allow entities to take any action based "solely" on an unconfirmed test unless there is other evidence that the individual poses a safety hazard. 10 C.F.R. § 26.75(h). But when the unconfirmed test is positive for marijuana, as in Ms. Williams's case, a regulated entity "may administratively withdraw the donor's authorization or take lesser administrative actions." *Id.* at § 26.75(i). The entity must ensure,

however, that there is "no loss of compensation or benefits" to the employee "during the period of temporary administrative action." *Id.* at § 26.75(i)(2). Xcel complied with this regulation by choosing to place an administrative hold on Ms. Williams's access after her initial positive test for marijuana.

DATWA, by contrast, does not allow an employer to "discharge, discipline, discriminate against, or request or require rehabilitation" of an employee based on an initial, unconfirmed positive test. Minn. Stat. § 181.953, subd. 10(a). Because the NRC's fitness-for-duty regulations allow for an administrative withdrawal of a donor's authorization to access a nuclear licensee's facility, one might assume that there exists a conflict between DATWA's employee protections for initial, unconfirmed positive tests. However, DATWA allows an employer to "temporarily suspend the tested employee or transfer that employee to another position" if the employer believes it is "reasonably necessary to protect the health or safety of the employee . . . or the public." *Id.* at subd. 10(c). So, DATWA explicitly allows what the federal regulations permit, as long as there is a safety justification—which there undoubtedly is with respect to unescorted access at a nuclear facility. Therefore, it is not impossible for an employer to comply with the FFD regulations and DATWA: indeed, Xcel itself did so by temporarily suspending Ms. Williams's access.

Second, consider what options are available to an employer after the initial positive test is confirmed. Federal regulations provide that a confirmed positive test "must, at a minimum, result in the immediate unfavorable termination of the individual's authorization for at least 14 days," but specifies that regulated entities "may impose more stringent sanctions." 10 C.F.R. §§ 26.75(a), (e). Xcel imposes the minimum sanction required by federal law, though

it also requires the employee to complete other steps to regain access, such as undergoing an assessment and completing a rehabilitation program if its Medical Review Officer determines that necessary.

If the positive test was the employee's first, DATWA does not allow an employer to discharge that employee based on a confirmed positive test without first giving them an opportunity to complete a rehabilitation program.  Minn. Stat. § 181.953, subd. 10(b).  So, the federal regulations require employees to terminate the individual's access (not her employment) for at least 14 days, and DATWA requires employers to give employees an opportunity to participate in a rehabilitation program before terminating their employment altogether.  It is possible to comply with both of these requirements at the same time.  The existence of Xcel's fitness-for-duty program, and how it responded to Ms. Williams's initial test, demonstrates this possibility.

BHI relies on what nuclear licensees "may" do under the federal regulations to create a conflict where none exists.  But that is not enough for a state law to be preempted.  "Conflict preemption analysis requires far greater specificity."  *Keller*, 719 F.3d at 944.  A state law is not conflict-preempted when the regulated entity "has complete power to avoid the conflict."  *Id.* at 945.  "To be preempted, the state regulatory scheme must irreconcilably conflict with the federal scheme. A hypothetical or theoretical conflict is insufficient to warrant preemption." *Flying J, Inc. v. Van Hollen,* 621 F.3d 658, 662 (7th Cir. 2010); *see also Ontario Food & Beverage, LLC v. Baker*, No. CV 18-00753-SJO (SP), 2018 WL 3357954, at *3 (C.D. Cal. June 13, 2018) ("The Court shall not seek out actual conflicts between state and federal law where none clearly exists and will not 'entertain hypothetical conflicts.'") (quoting *Barber v. State of Hawai'i*, 42 F.3d

1185, 1189 (9th Cir. 1994)).  For a state law to be preempted, it is not enough for a party to "rest on a supposition (or a wish)" that a conflict "must be in there somewhere."  *Va. Uranium*, 139 S. Ct. at 1901.

Further, even if there were any actual conflict between what was required under the federal regulations and Minnesota law, DATWA contains an express federal preemption provision instructing employers to follow what is required by federal law.  Although DATWA does not fully apply to employees who are "subject to drug and alcohol testing pursuant to federal regulations," it nevertheless requires their employers to comply with its protections for those employees "to the extent" that they are "not inconsistent with or specifically preempted by the federal regulations."  Minn. Stat. §§ 181.957, subds. 1 & 2.  Therefore, even if BHI could point to a particular conflict, or if Xcel had imposed more stringent sanctions as permitted by federal law, BHI would not have to follow DATWA where it would be inconsistent with federal law.  There is no actual conflict between the federal regulations and DATWA, and their provisions do not make compliance with both impossible.

As to obstacle preemption, BHI suggests that DATWA's "lenient penalties" stand as an obstacle to Congress's objectives in ensuring workers at nuclear facilities can safely perform their duties.  [BHI Opp'n 35, Dkt. No. 120.]  But as shown above, the minimum sanctions the federal regulations impose—and the actions Xcel took before BHI terminated Ms. Williams— are consistent with DATWA and its supposedly "lenient penalties."  In promulgating its fitness-for-duty regulations for nuclear facilities, the NRC has decided what licensees need to do, at a minimum, in response to a positive drug test to assure that employees are able to "safely and competently perform their duties."  10 C.F.R. § 26.23(b).  What is sufficient to

meet a regulated entities' obligations under federal law cannot be heralded now as an obstacle to accomplishing Congress's objectives.

DATWA "does not upend" the federal government's "carefully calibrated regulatory scheme—it operates within it." *R. J. Reynolds Tobacco Co. v. City of Edina*, 60 F.4th 1170, 1178 (8th Cir. 2023) (internal quotation marks omitted).  The text and structure of the Atomic Energy Act reflect the federal government's recognition that nuclear energy is best regulated through a cooperative regime among the states and the federal government.  Congress amended the Act specifically to allow the federal government to cede some regulatory authority to the States and "promote an orderly regulatory pattern between the Commission and State governments with respect to nuclear development and use." 42 U.S.C. § 2021(a)(3). Those amendments allow states to enact regulation infringing upon the core activities the Act reserved to the federal government so long as states do so "for purposes other than protection against radiation hazards."  42 U.S.C. § 2021(k).  DATWA fits neatly into this cooperative regulatory structure, both because it was not enacted for nuclear safety purposes, and also because it expressly recognizes the supremacy of federal law by requiring employers of individuals subject to federal drug testing to follow DATWA only "to the extent" it is "not inconsistent with" what is required by federal law.  The Court denies BHI's Motion for Summary Judgment because it has failed to establish that DATWA is preempted by federal law through either field preemption or conflict preemption.

## II.  Ms. Williams's Motion

Ms. Williams seeks affirmative partial summary judgment on the sole issue of BHI's liability under DATWA.  While the relationship between employee and employer is usually

terminable at will, "DATWA renders employers liable for certain actions taken against employees relating to drug and alcohol testing in the workplace." *Jones v. Green Bay Packaging, Inc.*, No. A15-0017, 2015 WL 4715538, at *2 (Minn. Ct. App. Aug. 10, 2015). As described above, Ms. Williams contends that BHI violated DATWA in three ways: (1) by failing to notify her of her right under state law to explain the positive test to BHI, (2) by terminating her immediately after her initial unconfirmed positive drug test, and (3) by terminating her without an opportunity to complete a rehabilitation program. BHI does not deny that it failed to notify Ms. Williams of any right to explain the positive test, that it terminated her on the same day as her initial unconfirmed positive test, or that it terminated her without providing an opportunity to participate in a rehabilitation program. Based on those undisputed facts, it appears that Ms. Williams is entitled to affirmative summary judgment with respect to BHI's liability under DATWA. However, one factual dispute gives this Court pause.

The parties do not agree on the reason for Ms. Williams's termination. Ms. Williams maintains that BHI immediately terminated her after her initial positive test based upon a zero-tolerance drug policy. In response, BHI contends that it actually terminated Ms. Williams because maintaining unescorted access to Xcel's facilities was an essential function of her job, and she was no longer able to meet this after Xcel put her access on administrative hold.

Evidence in the record supports both explanations. At her deposition, Ms. Williams testified in detail regarding what she remembered about the day she was terminated and to whom she spoke about the positive test. After receiving news of her positive test from Xcel's doctor, Ms. Williams contacted Randy Larson, BHI's Director of Operations, who said he "didn't understand or know the procedure," but at the previous nuclear plant he worked at,

employees were immediately terminated after a positive test.   [Williams Dep. 102, Dkt. No. 104-23.]  He said he would get more info.  [*Id.*]  Ms. Williams also called Paula Balatincz, her supervisor at BHI corporate headquarters, to inform her of the positive drug test.  [*Id.* at 84.]  Ms. Balatincz called her back after speaking to Paul Rubin, BHI's Chief Operating Officer, and informed Ms. Williams that "due to BHI having a zero drug tolerance policy," she was "terminated effective immediately."  [*Id.* at 85.]  Ms. Williams also spoke with Xcel's fitness-for-duty program coordinator.  Ms. Williams learned through this conversation that "worse case scenario" her badge was "suspended for a minimum of 14 days," and her access could be reinstated if Xcel or BHI requested it.  [*Id.* at 118–21.]  But this conversation occurred after Paula Balatincz already told Ms. Williams that BHI decided to terminate her.  [*Id.*]

After Ms. Williams received the Disciplinary Action Report in the mail providing written notice of her termination, she said that she spoke on the phone to Nancy Grigsby, BHI's Director of Human Resources.  [*Id.* at 134.]  Ms. Williams asked for the termination reason and was told it was "due to [her] recent drug test and confirmatory result."  [*Id.* at 134.]

No one from BHI can say who was actually responsible for the termination decision, which makes it difficult to identify the reason for the termination.  Randy Larson, BHI's Director of Operations, oversaw employees at Ms. Williams's plant.  He said he "played no role in the termination" and that it was "further up inside the BHI organization."  [Larson Dep. 14–15, 38, Dkt. No. 104-29.]  He said he "just needed to know whether or not Marilyn was going to be . . . reinstated, so we could get her back to doing her job."  [*Id.* at 27.]  Mr. Larson didn't recall how he learned that Ms. Williams was terminated or who informed him that she was terminated.  [*Id.* at 22.]  Mr. Larson's supervisor, BHI Vice President of

Operations Ken Sturtecky, offered a different explanation.  He said that on the date of Ms. Williams's initial positive test, Mr. Larson recommended Ms. Williams be terminated. [Sturtecky Dep. 12–18, Dkt. No. 104-28.]  Mr. Sturtecky concurred with the recommendation and told Mr. Larson to contact Nancy Grigsby to get Human Resources involved.  *Id.*  Mr. Sturtecky claimed Mr. Larson recommended that Ms. Williams be terminated "as part of the normal protocol for not maintaining unescorted access with the client."  [*Id.* at 15.]

Nancy Grigsby, BHI's Director of Human Resources, said that she was notified of the termination decision by Mr. Larson.  [Grigsby Dep. 19–20, Dkt. No. 104-27.]  She confirmed that Ms. Williams was terminated on July 20, 2020, denied that BHI had a zero-tolerance policy for positive drug tests, knew of other BHI employees who were permitted to remain employed after testing positive, and denied that Ms. Williams was terminated because she failed a random drug test.  [*Id.* at 48, 37, 56.]  Ms. Grigsby denied making the termination decision, testifying that the extent of her involvement in the termination was that she mailed Ms. Williams the Disciplinary Action Report.  [*Id.* at 75.]  She didn't recall who called Ms. Williams to officially inform her that she was being terminated.  [*Id.* at 80.]

BHI's Chief Operating Officer, Paul Rubin, said he played no role in the termination decision and does not know who made the decision to terminate her.  [Rubin Dep. 14–15, Dkt. No. 104-26.]  He did not recall having a conversation with Paula Balatincz about Ms. Williams's positive test, and he could neither recall nor deny telling Ms. Balatincz that Ms. Williams should be terminated because BHI has a zero-tolerance policy for positive drug tests.  [*Id.* at 23–26.]

34

Paula Balatincz, for her part, testified that Ms. Williams called her after finding out about the positive drug test, and she advised Ms. Williams to do what Xcel told her and to keep Ms. Balatincz posted. [Balatincz Dep. at 22–23; Dkt. No. 104-22.] Ms. Balatincz then walked down to Paul Rubin's office and informed him of the positive test. [*Id.* at 23.] She did not recall calling Ms. Williams back and saying that she spoke to Paul Rubin or communicating that BHI had a zero-tolerance drug policy and her employment was terminated as a result. [*Id.* at 30–31.] But she did recall a text message Ms. Williams sent her the next day, on July 21, asking if BHI would block her from applying for unemployment. [*Id.* at 31–32.]

Emails in the record raise more questions than they answer. Mr. Larson emailed Nancy Grigsby on the day of Ms. Williams's positive test to request BHI's current policies relating to drug testing. [Larson Dep. 29–30, Dkt. No. 104-29.] The next morning, on July 21, Ms. Grigsby sent Larson BHI's most up-to-date policy. [*Id.* at 30.] Two weeks later on August 4—after BHI had already terminated Ms. Williams—Terry Young, an Xcel employee and liaison to BHI, emailed Mr. Larson seemingly out of the blue, stating, "Randy, as discussed, I received notification from access authorization personnel on 7/20/20 that Marilyn's badge was placed on administrative hold. On 7/30, I received notification that access authorization was moving forward with access denial for Marilyn." [Dkt. No. 104-18.] A few hours later, Mr. Young sent another email to Mr. Larson: "Unescorted access for Marilyn has been denied for 14 days." [*Id.*] Mr. Larson then emailed Mr. Sturtecky and Ms. Grigsby that same day, on August 4, 2020, with a copy of the Disciplinary Action Report, which was later sent to Ms. Williams, providing her written notice of the termination. [Larson Dep. at 31–33; Disciplinary Action Report, Dkt. No. 104–18.]

Several months later, Mr. Larson forwarded Terry Young's August 4 email to Mr. Sturtecky on December 14, 2020, asking "Ok so why 14 days is that part of your procedures. I need to understand this." [Dkt. No. 104-18.] Mr. Sturtecky responded "Randy, Was her access not denied by Xcel"? [*Id.*] Mr. Larson responded, "Yes it was" and included Mr. Young's August 4 message. [*Id.*] Also on that day in December, Mr. Larson emailed Mr. Sturtecky and stated that "HR did the actual termination. I didn't get involved with that if you remember Ken." [Grigsby Dep. 74.]

The written Disciplinary Action Report also does not provide a conclusive answer resolving the factual dispute. The document is dated July 20, 2020 but was mailed to Ms. Williams on August 5, 2020, soon after the August 4 emails circulating among Mr. Larson, Mr. Sturtecky, and Ms. Grigsby. Mr. Larson testified that he filled out the Disciplinary Action Report and sent it to Ms. Grigsby. [Larson Dep. 60, Dkt. No. 104-29.] "Termination" is checked off as the disciplinary action taken, and the "Explanation" provided is "Marilyn failed a random drug test by the client." [Disciplinary Action Report, Dkt. No. 104-8.] This supports Ms. Williams's position, but further information is subsequently provided under the "Deficiency Statement" section. There, Mr. Larson wrote that "At 252 PM Monday July 20, Marilyn had her badge placed on administrative hold pending final outcome of her test results. On August 4 I was notified by Terry Young of Excel Monticello Station that Marilyn has been denied unescorted access." [*Id.*]

The parties both reference BHI's discovery responses, but those similarly fail to resolve the dispute. In BHI's Responses to Plaintiff's First Set of Requests for Admission, it "[a]dmitted in part" that BHI terminated Ms. Williams because she "failed a random drug test

by the client." [Dkt. No. 104-3 at 4.]  BHI's response explained that her termination was a "direct result" of Xcel revoking her authorization because an "essential condition" of her job was maintaining unescorted access to Xcel's facilities, and Xcel revoked her access after she failed a random drug test.  [*Id.*]  At the hearing, both parties also discussed an interrogatory answer signed by BHI's General Counsel, in which she stated that Mr. Sturtecky and Ms. Grigsby made the final decision to terminate Ms. Williams.  That interrogatory answer, however, is contradicted by the deposition testimony of Mr. Sturtecky and Ms. Grigsby, who both disclaimed involvement in that decision.

As to whether maintaining unescorted site access was an essential condition of her job, Ms. Williams points to BHI's job description for her role ("Field Administrator Manager"), which lists the "Essential Functions" for the job.  [Dkt. No. 104-14.]  Maintaining unescorted access is not included in that list or mentioned anywhere in the job description.  [*See id.*]  But BHI points to Ms. Williams's offer letter with BHI, which stated that her employment was at-will and would be conditioned upon "maintaining unrestricted client site access."  [Offer Letter, Ex. D at 2, Dkt. No. 112-1.]

The Court concludes that the factual dispute over the reason for Ms. Williams's termination is genuine.  But a genuine factual dispute only precludes summary judgment if the dispute is material—that is, its resolution would affect the outcome of the lawsuit.  *Anderson*, 477 U.S. at 248.  The Court finds that this factual dispute is not material to DATWA liability in this case.

First, the parties agreed at the hearing that the reason BHI terminated Ms. Williams is not a material fact to determining BHI's liability under DATWA.  Ms. Williams explained that

the termination reason doesn't matter because DATWA liability is premised on but-for causation, and but for the positive test result, she would not have lost access to Xcel's facilities. BHI conceded at the hearing that whether one frames an employee's termination as resulting from loss of access or a positive test, either way the employer would still be terminating that employee because of the positive test result, which violates DATWA. *See Rohde v. City of Blaine*, Civil No. 14-4546 (JRT/TNL), 2017 WL 214177, at *2 n.2 (D. Minn. Jan. 18, 2017) (finding factual dispute not material where parties disagreed as to the reason the defendant took an action but agreed that the action giving rise to liability occurred).

But even if the parties had not agreed that the factual dispute was not material, the Court concludes that resolving it does not affect the question of BHI's liability under DATWA.   The reason for Ms. Williams's termination is only relevant to the DATWA provision governing termination, and not the provision requiring written notice.   DATWA requires an employer to provide written notice of the right to explain the positive test after *every* positive test, regardless of any adverse actions the employer may take later or the reasons they take such actions.   "If an employee or job applicant tests positive for drug use, the employee *must* be given written notice of the right to explain the positive test."   Minn. Stat. § 181.953, subd. 6(b) (emphasis added).   There is no triable issue on BHI's liability regarding subdivision 6 of DATWA.   BHI undisputedly did not give Ms. Williams written notice of her right to explain the positive test to BHI, and liability premised on this requirement is not affected by the reason for her termination.   Consequently, the Court grants partial summary judgment to Ms. Williams and holds as a matter of law that BHI violated subdivision 6 of DATWA.   The reason for her termination is simply immaterial to violating this provision.

The part of DATWA governing terminations, however, presents a trickier question because that provision expressly premises liability on the employer taking the adverse action *based on* a positive drug test.  "An employer may not discharge, discipline, discriminate against, or request or require rehabilitation of an employee *on the basis of a positive test* result from an initial screening test that has not been verified by a confirmatory test."  Minn. Stat. § 181.953, subd. 10(a) (emphasis added).  This subdivision further precludes an employer from discharging an employee based on a confirmed positive test when it is the employee's first, unless "the employer has first given the employee an opportunity to participate in . . . a drug or alcohol counseling or rehabilitation program," and the employee has either refused to participate in the program or failed to successfully complete it.  *Id.* at § 181.953, subd. 10(b).  Ms. Williams claims that BHI violated subdivision 10(a) by immediately terminating her based on her initial positive test and violated subdivision 10(b) by terminating her without first providing an opportunity for her to complete a rehabilitation program.

Minnesota courts have interpreted the "on the basis of a positive test" language in subdivision 10 of DATWA to require that the employer's adverse action was dependent upon the positive test result.  In *City of Minneapolis v. Johnson*, 450 N.W.2d 156 (Minn. Ct. App. 1990), for instance, a police officer challenged his termination, which occurred after he admitted to using drugs on one occasion in the past, tested positive on a drug test, and failed to report suspected cocaine use he saw at a party when he was off duty.  Because the department did not provide him with an opportunity to complete rehabilitation before terminating him, the court concluded that the department did not comply with DATWA.  *Id.* at 160.  The positive

test could not be evidence of cause for discharge, the court held, and the discharge could "only be upheld if based solely on other factors." *Id.*

In another case involving a discharged police officer, the Minnesota Court of Appeals held that DATWA "does not bar the discharge of an employee for reasons independent of the test result." *In re Copeland*, 455 N.W.2d 503, 506 (Minn. Ct. App. 1990). There, the police department determined that the officer committed gross misconduct and did not meet his duties as a police officer because of his chemical dependency. Though he had failed a drug test, the court concluded that he "was not discharged because he failed a drug test; he was discharged because he failed to perform his duties." *Id.* at 506. The officer admitted that he used drugs frequently, that he failed to arrest the drug dealer from whom he purchased drugs, and that he twice reported to work under the influence of drugs. *Id.* at 505. The court construed DATWA's objective to be avoiding the "summary termination of an employee based solely on the result of one drug test" and held that the police department terminated the officer based on multiple acts of misconduct caused by a prolonged period of substance abuse—not because of an initial positive drug test. *Id.* at 507. The acts of misconduct furnished reasons for the discharge that existed independently of the positive test.

The Eighth Circuit has also weighed in on the issue of causation under DATWA, upholding the termination of an employee who refused to submit to a drug test mandated by federal law. *Belde v. Ferguson Enters., Inc.*, 460 F.3d 976 (8th Cir. 2006). Noting that Minnesota courts have "twice held that DATWA does not bar the discharge of an employee for reasons independent of the test result," the Eighth Circuit upheld the termination because the employee was discharged based on his refusal to take the test, rather than a positive test result.

*Id.* at 978–79 (quotation omitted).  These cases demonstrate that for a termination to be actionable under DATWA, the employer must have terminated the employee directly because of the initial positive test result or for a reason that depends upon the positive test result.

Here, even if the Court resolved the factual dispute in favor of BHI and accepted that it terminated Ms. Williams because she lost access to Xcel, no reasonable juror could find that reason to be "independent of the test result." *Belde*, 460 F.3d at 978 (quoting *In re Copeland*, 455 N.W.2d at 506).  The loss of access flows directly from the initial positive test.  The parties agree that Ms. Williams only lost access to Xcel's facilities because of the positive test.  Thus, her termination is not based "solely on other factors," *Johnson*, 450 N.W.2d at 160, and BHI cannot establish that it would have terminated her even if she had not tested positive. Regardless of how the Court resolves the genuine factual dispute over the termination reason, BHI would be liable under either reason because it terminated Ms. Williams based on an initial unconfirmed positive test and without an opportunity to complete a rehabilitation program. Therefore, the Court holds as a matter of law that BHI violated DATWA, and it awards affirmative summary judgment to Ms. Williams.

### III.    Order

For the foregoing reasons, **IT IS HEREBY ORDERED**:

1. BHI's Motion for Summary Judgment [Dkt. No. 108] is **DENIED**. Ms. Williams's DATWA claims against BHI are not preempted by federal law.

2. Ms. Williams's Motion for Partial Summary Judgment [Dkt. No. 102] is **GRANTED**.   The Court finds BHI liable for violating subdivision 6,

subdivision 10(a), and subdivision 10(b) of Minn. Stat. §181.953.  Damages will proceed to trial.

Date: **August 24, 2023**                    *s/ Katherine M. Menendez*
                                        Katherine M. Menendez
                                        United States District Judge